**WESTERN UNION TELEGRAPH CO. v.
KILGORE et ux. (No. 7776.)**

(Court of Civil Appeals of Texas. Galveston.
Dec. 11, 1919. On Motion for Re-
hearing, Feb. 25, 1920.)

**1. Telegraphs and telephones ⬀65(6)—Peti-
tion held to allege agreement to deliver mes-
sage in country.**

A petition, alleging that the agent re-
ceiving the message for transmission was told
that addressee lived in the country, necessitat-
ing delivery by messenger, the cost of which
was guaranteed, *held* to show agreement to
deliver in the country, notwithstanding a fur-
ther allegation of agreement to deliver mes-
sage to addressee at the station to which it
was transmitted, and hence a showing that he
was at the station was unnecessary.

**2. Pleading ⬀34(1)—Pleading not construed
as a whole on special exception.**

The rule that all parts of a pleading will be
considered to give effect to intention of pleador
is not applicable against a special exception.

**3. Telegraphs and telephones ⬀73(1)—Negli-
gence in failing to deliver message at coun-
try home held question for jury.**

In an action for failure to deliver telegram
at a home in the country, evidence to show that
addressee was at the home when delivery
should have been made *held* sufficient to justify
the refusal of a peremptory instruction for the
telegraph company.

**4. Evidence ⬀471(24)—Testimony that fu-
neral would have been delayed if telegram had
been delivered held not opinion.**

In sister's action for failure to deliver mes-
sage requesting brother to postpone burial of
father, brother's testimony that he would have
postponed burial until sister had arrived *held*
admissible against contention that it was a
mere expression of opinion.

**5. Evidence ⬀127(2)—Expression of mental
feelings competent where feelings are the
subject of injury.**

Where mental feelings are the subject of
injury, the usual natural sign and expression
of such feeling made at the time are competent
evidence of such feelings.

On Motion for Rehearing.

**6. Courts ⬀97(5)—Court of Civil Appeals
will follow state Supreme Court on federal
question not determined by federal courts.**

Where the effect of an act of Congress has
not been authoritatively settled by the Su-
preme Court of the United States, the Court
of Civil Appeals will follow the decisions of the
state Supreme Court.

**7. Telegraphs and telephones ⬀68(2)—Men-
tal anguish alone not recoverable for non-
delivery of interstate message.**

Under Act Cong. June 18, 1910, § 7 (U. S.
Comp. St. § 8563) placing telegraph companies
under the jurisdiction of the Interstate Com-
merce Commission, and in view of Interstate

Commerce Act, § 15, as amended (U. S. Comp.
St. § 8583), telegraph company is not liable
for failure to deliver telegram, where the only
damage claimed to have been sustained is
mental anguish.

Appeal from District Court, Harris Coun-
ty; Wm. Masterson, Judge.

Suit by J. M. Kilgore and wife against the
Western Union Telegraph Company. Judg-
ment for plaintiffs, and defendant appeals.
Reversed and rendered for defendant.

Hume & Hume, of Houston, and Francis R.
Stark, of New York City, for appellant.
Atkinson & Atkinson, of Houston, for ap-
pellees.

PLEASANTS, C. J. This suit was brought
by appellees, J. M. Kilgore and wife, Georgia
A. Kilgore, against appellant to recover dam-
ages for the alleged negligent failure of ap-
pellant to deliver a telegram sent by Mrs.
Kilgore to her brother, Joe Fry, requesting
that the burial of her father's body be delay-
ed until she could be present at his funeral.

Plaintiff resides at South Houston, Harris
county, Tex., and James Fry, the father of
Mrs. Kilgore, at the time of his death on Oc-
tober 14, 1917, resided near Mansfield, Ark.
He died about 4 o'clock a. m. on the day stat-
ed, and a telegram announcing his death was
sent to Mrs. Kilgore by some member of the
family. In reply to this telegram Mrs. Kil-
gore, some time during the morning of Octo-
ber 14th, sent the following telegram:

"South Houston, Texas.
"Joe Fry, Mansfield, Arkansas. Hold body
until I reach there. Leaving to-day; reach
there to-morrow. [Signed] G. A. Kilgore."

The petition alleges that the agent of ap-
pellant at South Houston who received and
transmitted the message was fully informed
of the purpose of the message and the re-
lationship of the parties, and was told that
plaintiff's brother, Joe Fry, to whom the mes-
sage was sent, lived some distance in the
country from Mansfield, and that it would be
necessary to send a messenger out with the
telegram, and that plaintiffs guaranteed the
necessary charges for the delivery of the tele-
gram—

"and the said agent promised and undertook
the delivery of the message to Joe Fry at
Mansfield, Ark."

"It is further made known that, instead of
delivering said telegram to the said Joe Fry,
as promised, and instead of having said body
held for burial until plaintiff, G. A. Kilgore,
could arrive at Mansfield, Ark., the defendant
and its servants and agents at Mansfield, Ark.,
carelessly and negligently failed and refused
to deliver said telegram, and therefore her fa-
ther's body was not held for burial until she
could get there, but when plaintiff, G. A. Kil-
gore, arrived at Mansfield, Ark., on the 15th
day of October, 1917, her father's body had

⬀For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

been buried for several hours, and she was thereby deprived of the privilege of seeing his body and of attending his funeral, through the neglect of defendant, as aforesaid.

"She further shows that the disappointment which she endured by reason of the failure of being able to attend her father's funeral has caused her great mental anguish and suffering, whereby she has been damaged in the further sum of $1,500."

The defendant answered by general demurrer, special exceptions, general denial and special plea setting up the defense that the message was interstate commerce, and that liability for damages for failure to deliver said message must be determined by the laws of the United States and rules of decision of the United States courts, and under such laws and rule of decision damages for mental anguish caused by the breach of a contract to deliver a telegraphic message cannot be recovered.

The trial in the court below resulted in a verdict and judgment in favor of plaintiff for $1,500.

The evidence sustains the following conclusions of fact: As before stated, plaintiff's father died at his home, about five miles from Mansfield, Ark., early in the morning of October 14, 1917. A short time after the death of the father the following telegram was delivered to the agent of appellant at Mansfield and transmitted to South Houston, Tex., and there delivered to Mrs. Kilgore:

"Mansfield, Arkansas, October 14, 1917.

"Mrs. G. A. Kilgore, South Houston, Texas. Papa passed away at 4 a. m. Come or answer.     [Signed] Joe Fry."

Mrs. Kilgore received this telegram about 11 o'clock a. m., on said date, and in response thereto sent the telegram first above set out. Joe Fry did not sign the telegram, which was sent to Mrs. Kilgore, but it was prepared and sent by his brother, W. A. Fry, who was at his father's residence at the time of his death, who for some reason not disclosed by the evidence sent it in Joe Fry's name. Joe Fry did not live with his father, but lived at his own home five or six miles from his father's, and about nine miles from Mansfield. The message to Mrs. Kilgore was given to Robert Ricks by some member of the Fry family and delivered by Ricks to the appellant's agent at Mansfield. This agent testified that he did not know Ricks nor Joe Fry, and thought at the time that the message was delivered to him by Joe Fry. He further testified that at the time Ricks filed the message with him he requested him to hold the answer, and stated that he would call for it.

In regard to the sending of the message requesting that the funeral be delayed until Mrs. Kilgore arrived, plaintiff, J. M. Kilgore, testified:

"I sent the message on October 14, 1917. I had some conversation with the lady operator about the delivery of the message. I stated:

'Now, Mrs. McKowan, I don't know, but they tell me it is five miles or about five miles in the country; I don't know what the delivery charges will be. If I knew I would pay it, but I don't know, but you have that delivered, and I will pay the charges; it don't matter what it is, because it will be within reason.' And she says: 'All right, Mr. Kilgore; I will do my best to have it delivered.' She says: 'Will find out whether it goes through or not, and then I will try to have it delivered; that is all I can do.' I said: 'That is all right; be sure you do now.' And she said: 'I will.'

"After the train left I told Mrs. McKowan, 'You be sure and attend to that message,' and she stated, 'I will wire there and see if it got through.'"

Mrs. J. M. Kilgore, plaintiff, testified:

"My father lived five miles from the city of Mansfield. They call it five miles, it is so rough. It did not seem to be that far. I told Mrs. McKowan about where they lived. I had told her on Friday before that I had sent a message there concerning his health, and told her now it is five miles from town.

"We got on the train at South Houston, Tex., about 12 o'clock noon on October 14, 1917. We reached Mansfield on the 15th. I do not remember exactly what time, the train might have been a little late, but it was due there at 7 something, and it might have been a little late. It was at night when we got there, on the night of October 15th, when we arrived at Mansfield, Ark.

"I arrived at my father's house some time between the time I got to Mansfield and midnight. I guess I must have got there about 10:30 or 11. I do not know. I hired an automobile to take me out there. My son, Lee Wilson, was with me.

"When I reached my father's house that night, he had already been buried. The distance from where he is buried to my father's house is about six miles; at least they call it six miles."

The message reached Mansfield a few minutes after 12 o'clock on the 14th day of October, 1917. The agent there testified that the reason he made no effort to deliver it was that Ricks, when he gave him the message to be sent to Mrs. Kilgore, told him that he would call for the answer, and asked him to hold it. The message was never delivered.

Joe Fry testified that if the telegram from Mrs. Kilgore had been received the funeral would have been delayed until her arrival.

Mrs. Kilgore suffered anguish and distress of mind because her father was buried before she arrived at his home, and she was deprived of the consolation of seeing his body and being present at his funeral.

Under its first assignment of error, which complains of the refusal of the trial court to instruct the jury to return a verdict in favor of the defendant, appellant contends that the charge should have been given because the petition alleged that the defendant promised and undertook to deliver the message to Joe Fry at Mansfield, and the uncontradicted evidence showed that Joe Fry did not live at

Mansfield, and there is no evidence showing, or tending to show, that he was at Mansfield on either the 14th or 15th of October, 1917.

If the petition could be properly construed as only alleging a contract on the part of appellant to deliver the telegram at Mansfield, it being shown that the addressee did not live at that place, but resided in the country nine miles from that town, and there being no evidence that he was in Mansfield on the day the telegram should have been delivered, appellant could not be held liable for failure to deliver the message. W. U. Tel. Co. v. Swearingen, 95 Tex. 423, 67 S. W. 767; W. U. Tel. Co. v. Byrd, 34 Tex. Civ. App. 594, 79 S. W. 40; W. U. Tel. Co. v. Shockley, 57 Tex. Civ. App. 30, 122 S. W. 945.

But the petition in this case should not be construed as only alleging a contract and agreement by appellant to deliver the message at Mansfield. It alleges that the agent who received the message for transmission was told that the addressee lived some distance in the country from Mansfield, and that it would be necessary to send a messenger to deliver the telegram, and that plaintiff guaranteed the cost of the delivery in the country, "and the said agent promised and undertook the delivery of said telegram to said Joe Fry at Mansfield, Ark."

[1, 2] We think when this paragraph of the petition is considered as a whole it should be construed as alleging that appellant's agent, knowing plaintiff's purpose in the sending of the telegram and the necessity for its prompt delivery, agreed to accept plaintiff's guaranty of payment of the necessary messenger's fee, and to have the message sent to Joe Fry in the country at or near Mansfield, the station to which the telegram was transmitted. The allegations as to the information given the agent in regard to the residence of the addressee and the guaranty by plaintiff of the necessary messenger fee for delivery of the message in the country are not given any effect if the clause "at Mansfield, Arkansas," is given the literal meaning contended for by appellant. To construe the petition in this way is violative of the fundamental rule of construction that all parts of an instrument, if it is possible so to do without disregarding the plain intention of the maker, must be given effect. As against a special exception this general rule of construction is not applicable, but as the question is here raised we think the rule is applicable.

[3] It is further contended that the peremptory instruction should have been given because there was no evidence showing where Joe Fry was on the 14th and 15th of October, 1917.

There is no direct testimony showing where Joe Fry was on said dates, but it is a fair inference from the testimony as a whole that during said time he was at his father's home, and the evidence does show that the agent at Mansfield understood that the telegram was to be delivered at the father's home. He testified in regard to sending the message announcing the death of Mr. Fry, and, after stating that the party who delivered the message to him told him that he would call for the reply, he says:

"When I received a reply from South Houston, Tex., I held it on account of the party stating he would call for the message. We held the message until 8 p. m.; then I had the operator send a service message, stating the message was not delivered. I got a service message then from South Houston, saying that the party was or could be located on the phone line, and to phone it out to Joe Fry. The original message that she sent was: 'Hold body until I reach there, leaving here to-day.' Service message reads: 'See your service message 14. Am advised that you can reach Joe Fry over phone. Message is very important. South Houston, Texas, 14.'"

He also testified that he told Mrs. Kilgore that the reason he did not phone the message out when he received the answer to his service message was that the phone was out of order.

We think this testimony shows that the agent understood that the message was to be delivered to the home of the deceased, and if it had been delivered there its purpose would have been accomplished.

There is no merit in the further contention under this assignment that the charge should have been given because it was not shown that the body of the deceased could have been kept until Mrs. Kilgore arrived. The undisputed testimony is that the funeral would have been postponed if the telegram had been delivered.

What we have above said disposes of the questions raised under the first six assignments presented in appellant's brief.

The seventh assignment complains of the ruling of the court shown in the following bill of exceptions:

"Be it remembered, that upon the trial of the above styled and numbered cause in the aforesaid court and made at the May term thereof, 1918, the following proceedings were had:

"Plaintiff offered and read in evidence over defendant's objection thereto duly made, direct interrogatory No. 15, and the answer thereto, of the deposition of J. B. Fry, a witness for plaintiff in chief, said interrogatory being as follows: 'If you say you had not received a telegram from Georgia A. Kilgore, requesting you to delay the burial of her father's body until she arrived there, state whether or not you would have delayed the burial until she got there, if you had received the telegram.' And the answer to said interrogatory was as follows: 'If we had received such telegram we would have delayed the burial until she got there.'

"Defendant's objections to said interrogatory were as follows: That said evidence was incompetent, immaterial, irrelevant and hearsay, and the mere opinion and conclusion of the witness.

"Defendant's said objections were by the court overruled, and said interrogatory and the answers thereto were admitted in evidence; and

defendant here and now presents this, its bill of exceptions No. 1, to the action of the court, and respectfully asks that it be approved by the court, and ordered filed herein as a part of the record in this cause."

[4] We do not think the court erred in this ruling. This testimony was not the expression of a mere opinion or conclusion by the witness, but a positive statement of a material fact. The witness was not cross-examined by appellant as to his personal knowledge of the fact stated, and there is nothing to indicate that he was speaking from hearsay.

Assignments 8 to 11, inclusive, complain of the admission of testimony as to the apparent mental condition and signs and expressions of grief by Mrs. Kilgore when she found that her father had been buried before her arrival. One witness testified:

"She was very much grieved. She went down to the grave and she fell on the grave and was unable to rise, and she had to be lifted and carried back."

Three other witnesses testified to substantially the same facts, and the testimony of each was objected to on the ground that the evidence was "incompetent, immaterial, irrelevant, hearsay, prejudicial, and inflammatory."

[5] We think the trial court ruled correctly in holding this testimony admissible. It is a settled rule of law that where the mental feelings are the subject of injury, the usual and natural signs and expressions of such feeling made at the time are competent evidence of such feelings. Under this rule the appearance and spontaneous acts of Mrs. Kilgore when she found that her father had been buried before her arrival were natural expressions of her grief, and were admissible to show the extent of her mental suffering. The detailed statement of the witnesses of these natural expressions of her mental anguish should not be excluded on the ground that such testimony is prejudicial and inflammatory. Railway Co. v. Shafer, 54 Tex. 648; Railway Co. v. Stephens, 198 S. W. 406; Railway Co. v. Boyer, 44 Tex. Civ. App. 311, 97 S. W. 1070.

There is no merit in the assignment attacking the verdict on the ground that it is excessive in amount, and the assignment is overruled without discussion.

The question presented by the last assignment has been decided adversely to appellant's contention. The contract having been made in Texas, and suit for its breach being brought here, the laws of this state fix appellee's remedy, and the enforcement by our courts of such remedy does not violate the interstate commerce clause of the Constitution of the United States. Telegraph Co. v. Bailey, 108 Tex. 427, 196 S. W. 516; Id., 184 S. W. 519.

Affirmed.

### On Motion for Rehearing.

In our former opinion in this case affirming the judgment of the court below, we followed the opinion of our Supreme Court in the case of Telegraph Co. v. Bailey, 108 Tex. 427, 196 S. W. 516, in which it is held that the Act of Congress of June 18, 1910, § 7 (U. S. Comp. St. § 8563) placing telegraph companies under the jurisdiction and control of the Interstate Commerce Commission, does not deprive the courts of the several states of authority to enforce the state rules of law as to the measure of damages for breach of a contract for the delivery of an interstate telegraphic message. In the case cited the act of Congress was construed as not in any manner affecting the liability of a telegraph company for damages for failure to deliver or delay in delivering an interstate message as that liability was fixed and measured by the law of the state in which the contract for the transmission and delivery of the message was executed. In discussing the question the court says:

"In the absence of legislation by Congress the right of a state to prescribe its own rules in respect to particular subjects of interstate commerce, which do not constitute a direct burden upon such commerce, is undoubted. Railway v. Harris, 234 U. S. 412, 34 Sup. Ct. 790, 58 L. Ed. 1377, L. R. A. 1915E, 942; Telegraph Co. v. Milling Co., 218 U. S. 406, 31 Sup. Ct. 59, 54 L. Ed. 1088, 36 L. R. A. (N. S.) 220, 21 Ann. Cas. 815. While the measure of damages recoverable for the breach of the contract for the nondelivery of the message in this case would be governed by the law of Tennessee, the place of the making of the contract, no evidence was adduced as to the law of that state upon the subject. It is therefore presumed to be similar to the law of this state. The correctness of the rule which in this state permits the recovery of damages for mental distress, and which allows such damages even in the instance of an interstate message where the negligence occurs in this state and such damages are recoverable under the law of the state from which the message is sent, furnishes no test of this immediate question. The real test of it is: Does the enforcement of such a rule constitute a direct burden upon interstate commerce? It cannot be said to impose any such burden. It is no more of a burden upon such commerce than is a penalty prescribed by a state for misconduct of an interstate carrier occurring within its borders, the lawfulness of which, in the absence of legislation by Congress upon the particular subject, has in different instances been repeatedly affirmed by the Supreme Court of the United States. Telegraph Co. v. James, 162 U. S. 650, 16 Sup. Ct. 934, 40 L. Ed. 1105; Railway Co. v. New York, 165 U. S. 628, 17 Sup. Ct. 418, 41 L. Ed. 853; Gladson v. Minnesota, 166 U. S. 427, 17 Sup. Ct. 627, 41 L. Ed. 1064; Railroad Co. v. Hughes, 191 U. S. 477, 24 Sup. Ct. 132, 48 L. Ed. 268. * * *

"If this amendment was an exertion by Congress of its authority over the subject of the liability of telegraph companies for the negligent nondelivery of interstate messages, including that of their right to provide by contract ·that they should be exempt from such liability, or if it clearly manifested a purpose on the part of Congress to extend its authority over those subjects, the rules of the state upon them are, of course, superseded. But we ·do not regard the amendment as open to any such construction. It is not necessary to here set· it out, but its examination reveals that it classifies telegraph companies doing an interstate business as common carriers within the meaning of the act; requires that their charges shall be just and reasonable; prohibits every unjust and unreasonable charge; permits their classification of messages and the charging of different rates therefor; and, further, in section 15 as amended (Comp. St. § 8583), empowers the Interstate Commerce Commission to determine, after complaint made, whether their charges, regulations, or practices are unjust, unreasonable, discriminatory, or otherwise in violation of the act, and, if it be of the opinion that they are, to prescribe those which are just, fair, and reasonable. There is no mention of the liability of such companies for negligence. That subject is not dealt with or touched upon. If it had been the purpose of Congress to legislate upon it, we think it would have done so in terms clear and unmistakable. We are not required to assume that such was the intention in the absence of its clear manifestation. The laws of a state as they may be properly directed to the subjects of interstate commerce are not to be held as inconsistent with an act of Congress unless they present an absolute conflict, or unless, at least, a purpose on the part of Congress to legislate upon the particular subject is clearly revealed."

[6] There has been a sharp conflict in the decision of the courts of many of the states upon this question, and that conflict, so far as we were aware, not having been authoritatively settled ·by the Supreme Court of the United States, we followed the decision of our state Supreme Court, of the soundness of which we had no doubt.

But in their motion for rehearing appellant has cited two recent opinions by the Supreme Court of the United States which were not published when our . former opinion in this case was delivered, and in both of which the cases from the state courts, in which the act is construed as regulating the liability of telegraph companies for breach of contract for the delivery of an interstate message, and denying to a state the authority to fix a penalty or to enforce through its courts a rule for the measure of damages for such breach of contract which is not recognized and applied by the courts of the United States, are expressly approved.

The cases referred to are Postal Telegraph Cable Co. v. Warren-Godwin Lumber Co., 251 U. S. 27, 40 S. Ct. 69, 64 L. Ed. ——; decided December 8, 1919, and ·Western Union

Telegraph Co. v. Boegli, 251 U. S. .315, 40 S. Ct. 167, 64 L. Ed. —— decided January 12, 1920. We have been furnished with a copy of the opinion of Chief Justice White in the Boegli Case, from which we quote:

"The telegraph company challenged the right to subject it to a penalty fixed by a law of Indiana for failure to deliver promptly in that state a telegram sent there from a point in Illinois, on the ground that the act of Congress of June 18, 1910, amending ·the Act to Regulate Commerce (36 Stat. 539, 543), had deprived the state of all power in the premises. The court, conceding that if the act of Congress dealt with the subject the state statute would be inoperative, imposed the penalty on the ground that the act of 1910 did not extend to that field. The correctness of this conclusion is the one controversy with which the arguments are concerned.

"The proposition that the act of 1910 must be narrowly construed so as to preserve the reserved power of the state over the subject in hand, although it.is admitted that that power is in its nature federal and may be exercised by the state only because of nonaction by Congress, is obviously too conflicting and unsound to require further notice. We therefore consider the statute in the light of its text, and, ·if there be ambiguity, of its context, in order to give effect to the intent of Congress as manifested \in its enactment.

"As the result of doing so, we are of opinion that the provisions of the statute bringing telegraph companies under the Act to Regulate Commerce, as well as placing them under the administrative control of the Interstate Commerce Commission, so clearly establish the purpose of Congress to subject such companies to a uniform national rule as to cause it to be certain that there was no room thereafter for the exercise by the several states of power to regulate, by penalizing the negligent failure to deliver promptly, an interstate telegram, and that the court below erred therefore in imposing the penalty fixed by the state statute.

"We do not pursue the subject further, since the effect of the act of 1910 in taking possession of the field was recently determined in exact accordance with the conclusion we have just stated. Postal Telegraph Cable Co. v. Warren-Godwin Lumber Co., 251 U. S. 27, 40 Sup. Ct. 69, 64 L. Ed. ——. That case, indeed, was concerned only with the operation, after the passage of the act of 1910, of a state statute rendering illegal a clause of a contract for sending an interstate telegram limiting the amount of recovery under the conditions stated in case of an unrepeated message; but the ruling that the effect of the act of 1910 was to exclude the possibility thereafter of applying the state law was rested, not alone upon the special provisions of the act of 1910 relating to unrepeated messages, but upon the necessary effect of the general provisions of that act, bringing telegraph companies under the control of the Interstate Commerce Act. The contention as to the continuance of state power here made is therefore adversely foreclosed. Indeed, in the previous case the principal authorities here relied upon to sustain the continued right to exert state power after the passage of the act of 1910 were disapproved, and various decisions of state courts of last

resort to the contrary, one or more dealing with the subject now in hand, were approvingly cited."

While the question of the proper rule for the measure of damages in cases of breach of contract for the delivery of an interstate message was not involved in either of the cases cited, many of the opinions which these cases refer to and expressly approve involved only that question. This is true of the following cases: Durre v. Western Union Tel. Co., 165 Wis. 190, 161 N. W. 755; Norris v. Western Union Tel. Co., 174 N. C. 92, 93 S. E. 465; Bateman v. Western Union Tel. Co., 174 N. C. 97, 93 S. E. 467, L. R. A. 1918A, 803. The same question was involved, together with other questions, in Western Union Tel. Co. v. Lee, 174 Ky. 210, 192 S. W. 70, Ann. Cas. 1918C, 1026, and Western Union Tel. Co. v. Hawkins, 14 Ala. App. 295, 70 South. 12.

As typical of the reasoning and conclusions in the cases cited with approval in the foregoing opinions, we may quote briefly from Western Union Tel. Co. v. Schade, 137 Tenn. 214, 192 S. W. 924:

"It is not to be doubted that, since the Congress by the passage of the amendatory act above referred to has entered the field and assumed the regulation of interstate telegraphic communication, the liability of the common carrier for mental suffering is also controlled by the federal law (Adams Express Co. v. Croninger, 226 U. S. 491, 33 Sup. Ct. 148, 57 L. Ed. 314, 44 L. R. A. [N. S.] 257; Western Union Tel. Co. v. Brown, 234 U. S. 542, 34 Sup. Ct. 955, 58 L. Ed. [1457]); which law supersedes state regulation and decisions ad hoc (Western Union Tel. Co. v. Compton, 114 Ark. 193, 169 S. W. 846; Western Union Tel. Co. v. Smith [Tex. Civ. App.] 188 S. W. 702, and the telegraph cases cited above).

"The rights and liabilities of the parties depend, therefore, upon the terms of the contract entered into, and the common-law principles accepted and enforced by the federal courts. One of these principles is that damages for mental anguish only, claimed to be due to the carrier's default, are not recoverable."

[7] Under these decisions of the Supreme Court of the United States we are constrained to grant appellant's motion for a rehearing. The only damage claimed to have been sustained by appellee is the mental anguish suffered by Mrs. Kilgore as a result of her inability to attend her father's funeral which was caused by the failure to deliver the telegram sent from Houston, Tex., to her brother at Mansfield, Ark., advising him that she would attend the funeral, and, such damages not being recoverable for a breach of a contract for the delivery of an interstate telegraphic message, the judgment of the trial court is reversed, and judgment here rendered for appellant.